**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF INDIANA**
**FORT WAYNE DIVISION**

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | ) | |
| | ) | |
| v. | ) | Cause No.: 1:07-CR-68-TLS |
| | ) | |
| TAUREAN L. HAYDEN | ) | |

**OPINION AND ORDER**

This matter is before the Court on the Defendant's Motion to Suppress Evidence (DE 39).

The Defendant asks the Court to suppress all evidence found: (1) during the search of a residence

located at 5024 Salt Trail Canyon Pass in Fort Wayne, Indiana; (2) during the search of a black

Pontiac Grand Prix automobile; and (3) during the search of a Dodge Charger automobile

located in the garage at 5024 Salt Trail Canyon Pass. For reasons the Court explains below, all

three requests are denied.

**BACKGROUND**

On March 15, 2007, a complaint was filed under seal before Magistrate Judge Cosbey

charging the Defendant with knowingly and intentionally possessing with the intent to distribute

between five hundred grams and five kilograms of cocaine in violation of 21 U.S.C. § 841(a)(1).

Judge Cosbey issued an arrest warrant for the Defendant that same day. The warrant was

returned executed on July 16, 2007. The grand jury returned a two-count indictment along with a

forfeiture allegation on July 25, 2007. Count one charges that on or about March 9, 2007, the

Defendant knowingly and intentionally possessed with the intent to distribute five hundred

grams or more of cocaine in violation of 21 U.S.C. § 841(a)(1). Count two charges that on that

same day the Defendant knowingly carried a firearm during and in relation to a drug trafficking

crime in violation of 18 U.S.C. § 924(c). The indictment alleges that upon conviction of the offense charged in count two, the Defendant must forfeit the firearm and ammunition involved in the commission of the offense pursuant to 18 U.S.C. § 924(d) and 28 U.S.C. § 2461(c). The Defendant pleaded not guilty to the charges on August 1, 2007.

The Defendant filed the motion to suppress that is before the Court on October 26, 2007, and the Government responded on November 5, 2007. The Court held an evidentiary hearing on the motion on December 13, 2007. The Defendant then filed a brief in support of his motion to suppress on April 11, 2008, the government responded on May 12, 2008, and the Defendant replied on June 2, 2008. The Court then granted the government's request to file a sur-response, which it did on June 20, 2008, and the Defendant filed a sur-reply on June 26, 2008. The motion is now ripe for ruling.

## FINDINGS OF FACT

After considering the evidence submitted at the evidentiary hearing and considering the credibility of the witnesses, the Court makes the following findings of fact.

### A.    Search of Black Pontiac Grand Prix

At around 11:00 a.m. on March 9, 2007, Fort Wayne Police Department Detectives Darrick Engelman and Jean Gigli observed a black Pontiac Grand Prix parked facing the wrong direction on the north side of the street in the 500 block of East Taber Street. (Tr. 78.) The detectives were about two and a half blocks away, and Detective Gigli was using binoculars. (Tr. 80.) They could see a man sitting in the driver's seat of the Grand Prix (they later learned that

2

this was the Defendant) and a woman sitting on the floorboard behind the driver's seat facing the back window with her legs outside the car. (Tr. 78–79.) The woman sat there for a few minutes and appeared to be pressing down on something in the backseat area. (Tr. 79–80.) She then walked up to a house on East Taber Street, and the Defendant drove away to the 2300 block of Oliver Street. (Tr. 80.)

In the early afternoon on March 9, 2007, Detectives Roy Martin and Kim Seiss began conducting surveillance on a residence at 2344 Oliver Street after Detectives Engelman and Gigli informed them that the Defendant's car was last seen near Oliver and Creighton Streets. (Tr. 106–107.) Police had begun to suspect that the house might be involved in drug trafficking a week earlier when they followed an individual who had sold cocaine to a detective back to that address. (Tr. 107.) When they arrived near 2234 Oliver Street, they saw the Defendant's car parked in front of the house. (Tr. 108.) Police had also conducted surveillance on the Defendant's car on a couple of occasions within the prior month. (Tr. 123–24.)

As they were conducting their surveillance, Detectives Martin and Seiss observed a red Ford Thunderbird pull up and park in front of the house. (Tr. 108.) One of the occupants of the car went in the house for three to five minutes, came back out, and drove away in the Thunderbird. (Tr. 107–108.) Police then initiated a traffic stop, arrested two people in the car on outstanding warrants, and arrested the individual who had gone in the house for possession of marijuana. (Tr. 109.)

Detectives Martin and Seiss next saw a white Ford Expedition, being driven by DeShawn Burnett (who they knew to be a narcotics suspect), stop in front of 2344 Oliver Street. (Tr. 82, 109.) Burnett parked right next to the Defendant's Grand Prix. (Tr. 110.) They then saw the

Defendant walk out of the house they had been watching, get into his Grand Prix for a short period of time, then get into the front passenger side of the Expedition for thirty to forty seconds, and then finally get back out. (Tr. 82, 110, 112.) The Expedition then drove away. (Tr. 82.) After observing these events, Detective Martin suspected that narcotics trafficking was taking place. (Tr. 111.)

When the Expedition drove away, Detective Gigli checked on its license plate and learned from the police dispatch that the plate did not match a registered vehicle. (Tr. 83.) After Detective Gigli began following the Expedition, Burnett pulled over into a detached garage parking area, got out of his car, and took off running. (Tr. 84, 112.) As he was running, he discarded a kilogram of cocaine in between two houses. (Tr. 84–85.) Detective Martin tackled him and arrested him on the opposite side of the house from where he dropped the cocaine. (Tr. 85.) The cocaine was packaged in the shape of a brick with dark green or brown packaging. The police also found $800 in cash on Burnett's person. (Tr. 113.)

The police returned to their surveillance of 2344 Oliver Street (at this point around twelve detectives were involved in the surveillance). (Tr. 114, 117.) After they arrived, Detective Martin saw a female in a red Pontiac pull up to the residence. (Tr. 114–115.) She briefly spoke with the Defendant and went inside the house. (Tr. 115.) A short time later, she came out of the house with a dark-colored backpack, which she put in the trunk of the Pontiac. (Tr. 115.) Shortly thereafter, a gold Oldsmobile Aurora arrived at the house. (Tr. 115.) The woman with the dark-colored backpack then retrieved it and gave it to someone in the gold Aurora. (Tr. 116.) Detective Martin and other officers then followed the gold car and attempted to initiate a traffic stop. The car began driving erratically and someone inside threw the backpack out the passenger

window. (Tr. 116.) Police later retrieved the backpack and found marijuana in it, which heightened Detective Martin's suspicion that the house at 2344 Oliver Street was being used for drug trafficking. (Tr. 116–17.)

The Defendant was the next person to drive away from the house, again in his black Grand Prix. He drove away with one passenger in the front seat, and at this point detectives correctly suspected that the Defendant was the driver. (Tr. 117.) The Defendant's driving was consistent with tactics used to avoid being followed, particularly his straddling two lanes before turning at the last minute. (Tr. 118.) Eventually, the Defendant made a U-turn on Fletcher Avenue and pulled into the parking lot of a private business, where he sat for approximately a minute. (Tr. 120.)

During the ten minute drive from 2344 Oliver Street to the parking lot where the Defendant eventually stopped, Detective Martin observed the following traffic violations: failure to signal within 200 feet of making a turn, Ind. Code § 9-21-8-25, illegal lane changes, *id.*, and blocking a free passage, Fort Wayne, Ind., Code § 99.020(A). (Tr. 121, 125.) Detective Martin later issued two citations to the Defendant, one for an illegal lane change under state law and another for blocking the city sidewalk in violation of a city ordinance. (Tr. 121; Gov. Ex. 11.)

Detective Engelman did not observe any of the traffic infractions other than blocking a free passage, but he had been in continuous radio contact with the detectives who were following the Defendant's car. (Tr. 11, 12.) He then went to the lot where the Defendant was parked, and he observed the Defendant pull out of the business drive into the street, and then drive back into the business lot. (Tr. 12.) Detective Engelman parked his marked squad car in front of the Defendant's car and activated the police lights to effect a traffic stop. (Tr. 15.) Detective

Engelman was aware that the police computer system defined the Defendant as "Code X" (someone known to be armed). (Tr. 16.)

As the detective approached the Defendant's car, the Defendant began reaching down toward the center area of the vehicle, so Detective Engelman instructed the Defendant to show his hands, which he did. (Tr. 16.) Detective Engelman noticed the passenger in the car, but he does not recall that the passenger made any threatening movements. (Tr. 17.) As Detective Engelman was obtaining the Defendant's identification, he detected the odor of burnt marijuana emanating from the car. (Tr. 18, 34.) Detective Engelman thought the Defendant was acting suspiciously, as he was shaking, appeared nervous, and avoided eye contact with the detective. (Tr. 18.) Because he smelled marijuana, Detective Engelman removed the Defendant from the car and sat him in the back of the squad car, unhandcuffed. (Tr. 19.)

Detective Gigli arrived shortly after the stop and attended to the passenger. (Tr. 19.) As Detective Engelman was moving the Defendant from his car to the squad car, the detective told the Defendant that he would be searching his car because he smelled marijuana. (Tr. 33.) Once the Defendant was placed in the squad car, Detective Engelman asked the Defendant for consent to search the car. (Tr. 20; Gov. Ex. 2.) The Defendant initially refused, but when Detective Engelman informed the Defendant that he would "run a canine" on the car, the Defendant twice told the detective that he could search the car. (Gov. Ex. 2.)

After receiving consent to search the car, Detective Engelman looked into the front of the car on the passenger side and saw a small piece of a green, leafy substance on the passenger-side floorboard, which he believed was marijuana. (Tr. 23.) Detective Engelman then went to the squad car and handcuffed the Defendant. (Tr. 24.) The canine officer, Officer Doug Ambrose,

6

arrived and searched the perimeter of the car with his dog "Egres.". (Tr. 59–60.) As the dog was going around the car, he "showed interest" in the trunk and between the two passenger side doors, and he "alerted" on the right headlight area of the vehicle. (Tr. 60–61.) When the dog "shows interest" he stops walking and sniffs harder in an area. (Tr. 60.) When he "alerts," he signals to his handler that narcotics are present by stopping, sitting, and staring at the source of the odor. (Tr. 61.)

Detectives Engelman and Gigli then searched the interior of the car and discovered two hidden trap compartments. (Tr. 24, 133.) One compartment, which was empty, was open and immediately visible in the trunk. (Tr. 24, 133.) That compartment was operated by a piston. (Tr. 24.) Another was found closed under the rear seat, storing two kilograms of cocaine. (Tr. 24–25.) The carpet was loose around the compartment, which made Detectives Engelman and Gigli suspicious and led to them lift the seat and eventually find the compartment. (Tr. 40.) A third trap compartment, which contained a handgun, was later found behind the radio faceplate during the execution of a search warrant. (Tr. 48, 127.) After the detectives searched the car following the traffic stop, police towed the vehicle in accordance with Fort Wayne Police Department policy. (Tr. 96.)

Detective Seiss later obtained three search warrants from the Allen Superior Court in Fort Wayne, Indiana. She obtained a search warrant for 5024 Salt Trail Canyon Pass, Fort Wayne, Indiana, at around 10:00 p.m. on March 9, 2007, (Salt Trail Search Warrant, DE 42-2), based in part on the surveillance of 2344 Oliver Street and the subsequent search of the Defendant's black Grand Prix. (Salt Trail Search Warrant Aff., DE 42-2.) The warrant authorized the search of the residence for "Cocaine and derivatives thereof, marijuana, United States Currency, firearms

7

and/or weapons, paper and/or electronic records of drug transactions and/or other financial

information, computers, and items/documents that connect individuals with the residence." (Salt

Trail Search Warrant, DE 42-2.)

      A few days later, on March 13, 2007, around 3:00 p.m., she obtained a search warrant for

a gray and black 2006 Dodge Charger, VIN number 2B3KA53H36H244946. (Dodge Charger

Search Warrant, DE 42-3.) That warrant was based in part on evidence obtained from a prior

search of the car during the search of 5024 Salt Trail Canyon Pass. (Dodge Charger Search

Warrant Aff., DE 42-3.) At that same time, Detective Seiss obtained a search warrant to search

the Defendant's black Grand Prix, based in part on the previous search of the car. (Grand Prix

Search Warrant, DE 42-4; Grand Prix Search Warrant Aff., DE 42-4.)

## B.      Search of 5024 Salt Trail Canyon Pass Residence and Dodge Charger

      Detective Seiss's search warrant affidavit for the 5024 Salt Trail Canyon Pass residence

represents that there are eight pieces or groups of evidence indicating that the Defendant had

engaged in drug trafficking and related activities at 5024 Salt Trail Canyon Pass, Fort Wayne,

Indiana, and 3808 Knollcrest Road, Fort Wayne, Indiana.[1]

      First, the Fort Wayne Police Department "received numerous tips related to narcotics

trafficking being conducted by a Taurean Hayden." (Salt Trail Search Warrant Aff. 1, DE 42-2.)

The tips were independent from one another and they all indicated that the Defendant was a

narcotics trafficker. (*Id.*) One of these tips came from a confidential informant in December 2006

and January 2007 who alleged that the Defendant was "a large volume cocaine trafficker dealing

---

[1] A search warrant was also executed on the 3808 Knollcrest Road property, but the Defendant does not seek the suppression of any evidence obtained from that search.

in multiple kilos." (*Id.* at 1–2.)

The second piece of evidence was that the Defendant had been arrested previously for narcotics possession, including cocaine. (*Id.* at 2.) The third piece of evidence simply indicated that the Defendant maintained a residence at 5024 Salt Trail Canyon Pass. (*Id.* at 3.) That evidence was that the utilities for that home were in the Defendant's name. (*Id.*)

The fourth and fifth pieces of evidence were tips from two more confidential informants. On February 9, 2007, one month before the warrant was issued, a confidential informant, who had been arrested for possessing and dealing approximately one kilogram of cocaine, advised narcotics detectives that she had purchased cocaine from the Defendant at an address on Knollcrest Road in the past. (*Id.*) On February 16, 2007, an individual unrelated to the February 9 informant was arrested by the Allen County Drug Task Force for dealing cocaine. (*Id.*) The individual indicated that he or she bought the cocaine from "Tauren" and gave directions to "Tauren's" house, which ended on Knollcrest Road. (*Id.*)

This all led to the sixth group of evidence. Fort Wayne Police Department narcotics officers did "trash runs" at both the 5024 Salt Trail Canyon Pass and 3808 Knollcrest Road addresses and found evidence that the Defendant maintained both residences. (*Id.*) A trash run is a procedure where officers seize trash that is left outside a residence for collection and examine the contents. (*Id.* 3–4.) Officers found mail for the 5024 Salt Trail Canyon Pass address with the Defendant's name on it. (*Id.* at 4.) At the 3808 Knollcrest address, officers found marijuana and a drug test result that showed a failed drug test for cocaine and marijuana as well as multiple pieces of mail with the Defendant's name on them. (*Id.*)

Seventh, Detective Martin performed surveillance on the 5024 Salt Trail Canyon Pass on

February 16, 2007, and he observed the Defendant leaving that address in his black Grand Prix. (*Id.*) That same day, another officer observed the car in the garage of the residence. (*Id.*) Finally, the affidavit cites the March 9, 2007, investigations as evidence in support of probable cause.

When officers executed the search warrant for the 5024 Salt Trail Canyon Pass property, they located over $10,000 in cash in the kitchen along with the title to a Dodge Charger that was parked in an attached garage. (Tr. 141–42.) The title lists the seller's information, Mark A. Wilson of Fort Wayne, Indiana, but the spaces for the buyer's information are blank. (Gov. Ex. 16.) Prior to getting a warrant for the Dodge Charger, officers searched the trunk of the car and found approximately $300,000 in United States currency in various denominations. (Tr. 144–46; Dodge Charger Search Warrant Aff. 5, DE 42-3; Compl. 6, DE 1.) They also found the Defendant's identification card in the center console of the car. (Tr. 26.) They were able to open the trunk with keys that were left in the ignition. (*Id.*) The Dodge Charger was then towed pursuant to Fort Wayne Police Department policy. (Tr. 143; Dodge Charger Search Warrant Aff. 5, DE 42-3.) There is no indication in the record of what evidence, if any, was recovered subsequent to the issuance of the search warrant for the Dodge Charger.

## ISSUES

The Defendant presents three arguments in support of his motion to suppress evidence discovered in the search of the Salt Trail Canyon Pass residence, the Dodge Charger, and the Pontiac Grand Prix. First, the Defendant argues that Detective Seiss's affidavit in support of her application for a search warrant for the Salt Trail Canyon Pass property did not contain sufficient facts to establish probable cause in support of the issuance of a search warrant. Second, the

Defendant argues that the search of the Dodge Charger located in the garage attached to the Salt Trail Canyon Pass property exceeded the scope of the warrant for the residence. Third, the Defendant argues that there was no basis for stopping the Defendant in his Grand Prix, detaining him, and searching the vehicle.

## CONCLUSIONS OF LAW

### A.   Affidavit in Support of Salt Trail Canyon Pass Search Warrant

The Fourth Amendment provides:

> The right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated, and no Warrants shall issue, but upon probable cause, supported by Oath or affirmation, and particularly describing the place to be searched, and the persons or things to be seized.

U.S. Const. amend. IV. This means in part that police may only search a person's home "if there is probable cause to believe that the authorities will recover the items subject to seizure at the time they execute the warrant." *United States v. Newsom*, 402 F.3d 780, 782 (7th Cir. 2005).

The "central teaching of [Supreme Court] decisions bearing on the probable cause standard is that it is a 'practical, nontechnical conception.'" *Illinois v. Gates*, 462 U.S. 213, 231 (1983) (quoting *Brinegar v. United States*, 338 U.S. 160, 176 (1949)). "[P]robable cause is a fluid concept—turning on the assessment of probabilities in particular factual contexts—not readily, or even usefully, reduced to a neat set of legal rules." *Id.* at 232.

> The task of the issuing magistrate is simply to make a practical, common-sense decision whether, given all the circumstances set forth in the affidavit before him, including the 'veracity' and 'basis of knowledge' of persons supplying hearsay information, there is a fair probability that contraband or evidence of a crime will be found in a particular place.

*Id.* at 238.

"In issuing a search warrant, a magistrate is given license to draw reasonable inferences concerning where the evidence referred to in the affidavit is likely to be kept, taking into account the nature of the evidence and the offense." *United States v. Singleton*, 125 F.3d 1097, 1102 (7th Cir. 1997). For example, in issuing a warrant a judge may infer that evidence of drug dealing is likely to be found where a dealer lives. *Id.* "[W]hen observing activity of a person suspected of criminal activity, Government agents are entitled to reasonably rely upon their special knowledge and expertise to assess probabilities and draw inferences," *United States v. Marin*, 761 F.2d 426, 432 (7th Cir. 1985), and a judge may take into account the experience and special knowledge of officers if the search warrant affidavit explains the significance of specific types of information. *United States v. Lamon*, 930 F.2d 1183, 1189 (7th Cir. 1991).

"[A]fter-the-fact scrutiny by courts of the sufficiency of an affidavit should not take the form of *de novo* review. A magistrate's 'determination of probable cause should be paid great deference by reviewing courts.'" *Gates*, 462 U.S. at 232 (quoting *Spinelli v. United States*, 393 U.S. 410, 419 (1969)). "[T]he duty of a reviewing court is simply to ensure that the magistrate had a substantial basis for concluding that probable cause existed." *Id.* at 238 (quotation marks, brackets, and ellipsis omitted). "A magistrate's determination of probable cause '. . . should be overruled only when the supporting affidavit, read as a whole in a realistic and common sense manner, does not allege specific facts and circumstances from which the magistrate could reasonably conclude that the items sought to be seized are associated with the crime and located in the placed indicated.'" *Newsom*, 402 F.3d at 782 (quoting *United States v. Spry*, 190 F.3d 829, 835 (7th Cir. 1999)).

"If the search or seizure was effected pursuant to a warrant, the defendant bears the burden of proving its illegality . . . ." *United States v. Longmire*, 761 F.2d 411, 417 (7th Cir. 1985). "When, as here, the affidavit is the only evidence presented to the warrant-issuing magistrate, 'the warrant must stand or fall solely on the contents of the affidavit.'" *United States v. Koerth*, 312 F.3d 862, 866 (7th Cir. 2002) (quoting *United States v. Roth*, 391 F.2d 507, 509 (7th Cir. 1967)).

In his attack on the search warrant affidavit for the Salt Trail Canyon Pass residence, the Defendant makes two primary arguments. First, he argues that the tips from anonymous and confidential informants are not reliable. Second, he argues that most of the evidence in the search warrant affidavit points to drug trafficking activity at the Knollcrest Road Property. The government responds that the Defendant's method of isolating pieces of evidence in the affidavit and attacking the sufficiency of each piece of evidence individually ignores the totality of the circumstances analysis that governs the probable cause determination.

The government is correct that the Defendant's attack on the search warrant affidavit ignores the appropriate totality of the circumstances framework. The Defendant argues that the reference in the search warrant affidavit to the "numerous tips" that the Defendant is a narcotics trafficker lacks sufficient information establishing the reliability or veracity of the tips, or the tipsters themselves, and that there is insufficient explanation for the details surrounding the receipt of those tips (such as who specifically received the tips, when they received them, etc.). But that presents too narrow of a focus. The relevant inquiry is: in light of all the evidence presented in the search warrant affidavit, did the issuing judge have a substantial basis for believing that cocaine (and its derivatives), marijuana, United States currency, firearms, other

weapons, electronic or paper records of drug transactions, computers, and items or documents connecting individuals with the residence would be found at the 5024 Salt Trail Canyon Pass residence? Here, the judge did.

The affidavit states that on the same day that police were seeking a warrant for the Salt Trail Canyon Pass property, police officers discovered hidden compartments in the Defendant's car, and Detective Seiss stated in her affidavit that hidden compartments are often utilized by high volume narcotics traffickers. (Salt Trail Search Warrant Aff. 3, DE 42-2.) Police also found two kilograms of cocaine hidden in the compartments. (*Id.*). This evidence alone was sufficient to establish probable cause to believe that the Defendant was involved in the trafficking of cocaine. The remainder of the affidavit corroborates this suspicion. Officers recovered drugs from two other individuals leaving the Oliver Street address a short time before the Defendant left that same address. (*Id.* at 4.) Also, two different confidential informants independently admitted that they purchased cocaine from the Defendant for trafficking. (*Id.* at 2.) Even though the Defendant is correct that the reference to "numerous tips" relating to the Defendant's narcotics trafficking does not alone establish probable cause, all the evidence referenced in the search warrant affidavit together is more than enough to provide a substantial basis for the issuing judge's probable cause determination.

That the affidavit establishes probable cause to believe that the Defendant was engaged in narcotics trafficking does not necessarily mean there was probable cause to believe evidence of that trafficking would be found at the Salt Trail Canyon Pass residence. That is a separate conclusion that must also be supported by probable cause. In this regard the Defendant makes two arguments. First, he contends there is insufficient evidence in the affidavit to conclude that

the Defendant lived at the 5024 Salt Trail Canyon Pass residence. Second, he contends that the information in the affidavit indicates that any evidence of drug trafficking was more likely to be found at the Knollcrest Road property.

The Defendant's second argument is really beside the point. The fact that the evidence for searching the Knollcrest Road property may have been stronger than the evidence for searching the Salt Trail Canyon Pass property does not mean that there was not probable cause to search the Salt Trail Canyon Pass property. It just means that the evidence for searching one property was even stronger than the evidence for searching the other. The probable cause for searching the two properties is not mutually exclusive. The only issue then is whether or not there was probable cause to believe that evidence of drug trafficking would be found subsequent to a search of the Salt Trail Canyon Pass property.

> Warrants may be issued even in the absence of direct evidence linking criminal objects to a particular site. An issuing court is entitled to draw reasonable inferences about where evidence is likely to be kept, based on the nature of the evidence and the type of offense. In the case of drug dealers, evidence is likely to be found where the dealers live.

*United States v. Lamon*, 930 F.2d 1183, 1188 (7th Cir. 1991) (quotation marks and internal citations omitted).

Because there was probable cause to believe that the Defendant was engaged in drug trafficking, it was reasonable for the issuing judge to infer that evidence of that drug trafficking would be located at the Defendant's residence. In support of this inference, Detective Seiss stated in her search warrant affidavit that she has been trained in the methods and practices of drug traffickers and has participated in several hundred narcotics investigations. (Salt Trail Search Warrant Aff. 5, DE 42-2.) Based on that training and experience, which the issuing judge

was allowed to rely on, *see Lamon*, 930 F.2d at 1189, she concluded that high volume drug traffickers often utilize one or more residences to store narcotics and currency. Here there was sufficient evidence that the Defendant maintained a residence at the Salt Trail Canyon Pass property, even though he maintained at least one other residence as well. The utilities for the home were in the Defendant's name, mail was sent to the home in his name, and he parked the same car that he used for trafficking drugs in the garage of the residence.

The Defendant argues that the police lacked other evidence of ownership of the Salt Trail Canyon Pass property, such as rental records or telephone listings, that receiving mail might mean that he was a former resident rather than a current resident, and that there is no evidence the Defendant was ever present at the residence. That is all mostly true (except that officers witnessed the Defendant leave the residence, so there is evidence of his presence), but of no consequence. The fact that the police could have possibly obtained even more evidence does not mean that the evidence they did obtain is insufficient.

The Defendant also correctly argues that it is not the case that there is always probable cause to search a drug dealer's home merely because there is probable cause to believe that he is involved in drug trafficking. But here the car that the Defendant used to further his trafficking was parked at the residence. And while the Defendant has pointed to evidence indicating that there were even stronger indications that drug trafficking evidence would be discovered at the Oliver Street address, he does not point to anything indicating that it would be unreasonable to infer that the Defendant would maintain evidence of his trafficking at the Salt Trail Canyon Pass residence. Given that drug dealers often maintain evidence of trafficking at their residence, this was enough to establish probable cause to search the Salt Trail Canyon Pass property. *See id.*

16

(probable cause to search defendant's principal residence even though confidential informant said drugs were only dealt out of secondary residence based on inference that drug dealers often maintain evidence in residence they do not sell from). *Cf. United States v. Thomas*, 989 F.2d 1252, 1254–55 (D.C. Cir. 1993) (per curiam) ("observations of illegal activity outside of the home can provide probable cause for the issuance of a search warrant for a suspect's house, even in the absence of an allegation that any illegal activity occurred in the home itself"); *United States v. Riedesel*, 987 F.2d 1383 (8th Cir. 1993) (lawful seizure of drugs from defendant's car and large amount of cash from his person provided probable cause to support issuance of warrant to search his house); *United States v. Angulo-Lopez*, 791 F.2d 1394, 1399 (9th Cir. 1986) (probable cause existed to search defendant's residence, based on reasonable inference that suspected drug dealer would keep evidence at home); *United States v. Cruz*, 785 F.2d 399, 406 (2d Cir. 1986) (probable cause to search defendant's apartment despite absence of anyone who witnessed the defendant or his associates use the apartment).

The Defendant cites *United States v. McNeal*, 82 F. Supp. 2d 945 (S.D. Ind. 2000), in support of his contention that the search warrant affidavit does not sufficiently link him to the Salt Trail Canyon Pass residence. That case more likely proves the opposite. In *McNeal* the district court found that the search warrant affidavit failed to establish that the Defendant controlled the residence to be searched. *Id.* at 952. There were no observations of the defendant at the residence, there was no evidence of property ownership or rental records, and there was no information about telephone or utility listings. *Id.* That is not the case here, as police observed the Defendant leaving the Salt Trail Canyon Pass address as well as parking his car in the garage there, they found mail with his name and that address on it, and the utilities were kept in his

name. Unlike the affidavit in *McNeal*, this affidavit sufficiently connected the Defendant to the address.

The *McNeal* search warrant was also invalid because even though the attesting officer stated that his training established that it is common for records and proceeds to be kept at a location separate from the narcotics in order to conceal illegal activity, he did not say that a drug dealer is any "more likely to use a residential type structure for concealing such drug related matters than a non-residential structure." *Id.* at 955. Again, that is not the case here. Detective Seiss stated that based on her training and experience, it is common for drug dealers to maintain evidence of their trafficking at one or more of their residences. (Salt Trail Search Warrant Aff. 3, DE 42-2.)

Even if the Court were to agree with the Defendant that the Salt Trail Canyon Pass search warrant was not supported by probable cause, the Court still would not suppress the evidence obtained in the search. If evidence is recovered during the execution of a facially-valid search warrant that is later invalidated by the courts, the evidence is not necessarily suppressed. "In the absence of an allegation that the magistrate abandoned his detached and neutral role, suppression is appropriate only if the officers were dishonest or reckless in preparing their affidavit or could not have harbored an objectively reasonable belief in the existence of probable cause." *United States v. Leon*, 468 U.S. 897, 926 (1984). The Defendant has failed to show that the issuing judge abandoned a detached and neutral role, that Detective Seiss was dishonest or reckless in preparing the search warrant affidavit, or that the executing officers could not have harbored an objectively reasonable belief in the existence of probable cause.

18

**B.      Search of the Dodge Charger**

The Salt Trail Canyon Pass search warrant described the place to be searched as "a two-storey, single-family, wood-frame dwelling, that is gray in color with white trim, with the numbers '5024' located to the left of the garage door, that is commonly known as 5024 Salt Trail Canyon Pass, Fort Wayne, Allen County, Indiana." (Salt Trail Search Warrant, DE 42-2.) The Defendant argues that this warrant did not extend to a search of the Dodge Charger parked in the garage attached to the Salt Trail Canyon Pass property because the car was obviously not owned by the Defendant and the police had no evidence connecting the owner (Mark Wilson) with any criminal activities. The government responds that the Dodge Charger is just like any other container in the house and is eligible to be searched under the terms of the search warrant.

"A lawful search of fixed premises generally extends to the entire area in which the object of the search may be found and is not limited by the possibility that separate acts of entry or opening may be required to complete the search." *United States v. Ross*, 456 U.S. 798, 820–21 (1982). A warrant that authorizes the search of a home for evidence "also provides authority to open closets, chests, drawers, and containers in which the [evidence] may be found." *Id.* at 821. "This rule applies equally to all containers . . . ." *Id.* at 822. "[A] car parked in a garage is just another interior container, like a closet or a desk." *United States v. Evans*, 92 F.3d 540, 543 (7th Cir. 1996). The best practice for searching a car located in the garage of a home to be searched is to include a description of the vehicle in the warrant whenever the warrant is intended to extend to the car, but that practice is not mandated in every instance by the Fourth Amendment. *United States v. Percival*, 756 F.2d 600, 612 (7th Cir. 1985). As for ownership, "it does not matter whose [container] it is unless it obviously belonged to someone wholly uninvolved in the

19

criminal activities going on in the house." *Evans*, 92 F.3d at 543–44. It will rarely be apparent that a container does not belong to anyone connected with the illegal activity. *Id.*

The Defendant argues that this is that rare case where it should have been apparent to police that the car did not belong to anyone connected with drug trafficking. This is because the car's title lists Mark Wilson's name on the line provided for the seller's information. There are several problems with this argument. First, the title does not establish that Mark Wilson is the owner, and therefore does not overcome the reasonable presumption that a vehicle parked in an attached garage belongs to the home's owner. Indeed, even in *Percival* the car was not titled in the defendant's name, but the search was upheld nonetheless. *Percival*, 756 F.2d at 612. ("[William] Percival contends that prior to searching the trunk of the car, the agents discovered that the car was owned by a third party. . . . That search . . . revealed that the car was registered to Mrs. Barbara Percival."). While Mark Wilson was listed as the seller, the space for the buyer's information was blank. Furthermore, the title to the vehicle was in the Defendant's kitchen, and the Defendant's identification was located in the center counsel of the car. The most reasonable inference that the police would draw from these facts would be that the car was owned, or at least controlled, by the Defendant.

Second, even if it was apparent that the Defendant did not own the car, that is not the same as it being apparent that the car was owned by someone wholly uninvolved with the criminal activities connected to the house. If the police lacked any information about Mr. Wilson, which appears to be the case, then it could not be apparent to the them that he was wholly uninvolved in the Defendant's trafficking.

Third, the Defendant's argument proves too much. He says "the owner of the car was

clearly not Defendant Hayden," and he asserts instead that Mark Wilson owned the car. (Br. in

Supp. of Mot. to Suppress 7, DE 48.) If that is the case, then the Defendant has no basis for

challenging the search. "[I]n order to claim the protection of the Fourth Amendment, a defendant

must demonstrate that he personally has an expectation of privacy in the place searched, and that

his expectation is reasonable . . . ." *Minnesota v. Carter*, 525 U.S. 83, 88 (1998). If the car

belonged to someone other than the Defendant, then the Defendant has no expectation of privacy

in the car and cannot protest its search. *See United States v. Mazzone*, 782 F.2d 757, 759 (7th

Cir. 1986) ("no rights of [defendants] were violated by searches of vehicles in which they had no

proprietary interest").

The government argues that even if the car was not covered by the warrant, the doctrine

of inevitable discovery saves the evidence from suppression because the evidence would have

been discovered during the execution of the search warrant for the Charger.

> This doctrine allows the use of evidence if the government can show that the
> information ultimately or inevitably would have been discovered by lawful means.
> To demonstrate that a discovery was truly inevitable, the prosecution must establish
> that it had probable cause and prove the existence of a chain of events that would
> have led to a warrant independent of the search.

*United States v. Brown*, 328 F.3d 352, 357 (7th Cir. 2003) (internal citations, quotation marks,

and ellipsis omitted). When the government relies on the inevitable discovery rule, its burden is

to prove by a preponderance of the evidence that it would have uncovered the challenged

evidence through lawful means. *United States v. Gravens*, 129 F.3d 974, 979–80 (7th Cir. 1997).

The Defendant correctly notes that the search warrant affidavit for the Dodge Charger

bases the probable cause, at least in part, on evidence recovered from the prior search of the

Dodge Charger. Assuming *arguendo* that the search of the Dodge Charger was illegal, there still

may have been enough probable cause to support the search warrant without the evidence already seized, but the government does not sufficiently expound upon that analysis. To receive the benefit of the inevitable discovery rule, the government must normally offer testimony establishing what procedures it would have followed and how those procedures would have led ultimately to the discovery of the evidence. *See United States v. Jones*, 72 F.3d 1324, 1334 (7th Cir. 1995). Without that testimony, the government cannot receive the benefit of the inevitable discovery rule. Regardless, the point is moot given the Court's finding that the search of the Dodge Charger was legal.

### C.      Search of the Grand Prix

The Defendant argues that there was no basis for stopping the Defendant's Grand Prix, that there was no probable cause to search the vehicle, that if there was probable cause the search exceeded the permissible scope, that the Defendant's consent to search was either not given or was involuntary, and that the search exceeded the scope of any consent given.

### 1.      *Basis for Stop*

a.      Reasonable Suspicion of Drug Trafficking

As noted earlier, the Fourth Amendment protects people from unreasonable searches and seizures. U.S. Const. amend IV. When police officers stop an automobile and detain the occupants briefly, the stop amounts to a seizure within the meaning of the Fourth Amendment and must therefore be reasonable. *See Whren v. United States*, 517 U.S. 806, 809–10 (1996). A traffic stop is similar to an investigative detention and is thus governed by the principles set forth

in *Terry v. Ohio*, 392 U.S. 1 (1968). *See United States v. Finke*, 85 F.3d 1275, 1278 (7th Cir.

1996).

> Under *Terry v. Ohio*, police officers may conduct a brief, investigatory stop of a suspect if they have reasonable suspicion based on articulable facts that a crime is about to be or has been committed. "Reasonable suspicion" must be based on some objective manifestation that the suspect is involved in criminal activity. Although police may not detain a suspect based merely on a hunch, the likelihood of criminal activity need not rise to the level required for probable cause and falls well short of meeting a preponderance of the evidence standard. In evaluating the reasonableness of a stop, courts must examine the totality of the circumstances known to the officer at the time of the stop.

*United States v. Wimbush*, 337 F.3d 947, 949–50 (7th Cir. 2003) (citations omitted). The

circumstances justifying a *Terry* stop may include "the behavior and characteristics of the person

detained, as well as the experience of the officer." *United States v. Baskin*, 401 F.3d 788, 791

(7th Cir. 2005). "[N]ervous, evasive behavior is a pertinent factor in determining reasonable

suspicion," *Illinois v. Wardlow*, 528 U.S. 119, 124 (2000), as is presence in an area of expected

criminal activity. *Baskin*, 401 F.3d at 791.

　　　When law enforcement officers are in communication regarding a suspect, the knowledge

of one officer can be imputed to other officers under the collective knowledge doctrine for

purposes of determining whether there was reasonable suspicion to justify a *Terry* stop. *See*

*United States v. Lenoir*, 318 F.3d 725, 728 (7th Cir. 2003). If one officer is aware of specific and

articulable facts justifying an investigatory stop and relays his or her reasonable suspicion to

another officer, the second officer may rely on the information to effect a stop. *United States v.*

*Nafzger*, 974 F.2d 906, 910 (7th Cir. 1992).

　　　In determining whether a *Terry* stop is supported by reasonable suspicion, a court is not

limited to what the officer says was his suspicion or to evidence of his subjective rationale.

*United States v. Brown*, 232 F.3d 589, 594 (7th Cir. 2000). Instead, a court must look at the entire record to determine what facts were known to the officer and whether a reasonable officer in those circumstances would have been suspicious. *Id.*

Examining the totality of the circumstances, based on the information Detective Engelman had first-hand knowledge of, as well as the information Detective Martin and others communicated to him, there were specific and articulable facts that would make a reasonable officer suspicious that the Defendant was, or had recently been, engaged in criminal activity, namely drug trafficking.

Detective Engelman was in constant radio contact with the undercover officers conducting surveillance of the Defendant throughout the day. (Tr. 11.) Given the detective's constant radio contact with other surveillance detectives, he either personally observed or learned of the following events. At around 11:00 a.m. a woman was sitting on the floorboard behind the driver's seat of the Defendant's car (which was parked facing the wrong direction) for several minutes pressing down on something in the backseat area while the Defendant was sitting in the driver's seat. (Tr. 13, 79–80.) A little later in the day, the Defendant's car was parked outside of a house at 2234 Oliver Street, a house that police suspected was involved in drug trafficking after they followed an individual who had sold cocaine to a detective back to that address. (Tr. 107.)

An individual in a red Ford Thunderbird went into that house for three to five minutes before leaving, and police recovered marijuana from her person shortly after she left the home. (Tr. 107–109.) The Defendant left the house, got into his car with DeShawn Burnett for a short period of time (Burnett was already a narcotics suspect) and then got into Burnett's Ford

24

Expedition for thirty to forty seconds before Burnett drove away. (Tr. 82, 110, 112.) Police recovered a kilogram of cocaine from Burnett shortly thereafter. (Tr. 84–85, 112–13).

Next, a woman arrived at the house, spoke with the Defendant briefly, and went inside. (Tr. 114–16.) A short time later, she left the house with a dark-colored backpack and left in a gold Aurora. (*Id.*) When officers tried to pull that car over, the driver of the Aurora began driving erratically and someone inside threw the backpack out the passenger window. (*Id.*) Police recovered the backpack and found marijuana in it.

Finally, the Defendant drove away from the Oliver Street house in his Grand Prix. As he drove away, he engaged in driving techniques consistent with someone trying to avoid being followed. (Tr. 118.) For example, he would straddle two lanes before turning at the last minute.

"Reasonable suspicion amounts to something less than probable cause but more than a hunch." *Baskin*, 401 F.3d at 791. Here Detective Engelman had far more than a hunch that the Defendant was involved in drug trafficking. The Defendant's presence at a suspected drug house coupled with his evasive driving alone is probably enough to create reasonable suspicion. *Cf. id.* at 793 (unprovoked flight from police in an area of expected criminality creates inference of criminality). Add to that the fact that three people left the house on Oliver Street after brief visits while the Defendant was there and were found to have drugs on them shortly after leaving, and the inference that the Defendant was engaged in drug trafficking looks much more like probable cause than it does a hunch.

The Defendant argues that there are possible explanations that have nothing to do with the Defendant for how each of the visitors to the Oliver Street home were found to have drugs on them after leaving the home. The Defendant says it is possible that the marijuana was in the

Thunderbird before arriving at the home, that Burnett and the Defendant could have been doing something other than dealing drugs during the brief time they sat together in Burnett's car, and that the woman who retrieved the backpack with marijuana from the house could have done so without involving the Defendant. The Court does not deny that this is all within the realm of logical possibility, but these alternative conclusions defy common sense. "[B]ehavior which is susceptible to an innocent explanation when isolated from its context may still give rise to a reasonable suspicion when considered in light of all the factors at play." *Baskin*, 401 F.3d at 793.

The Defendant also takes issue with the government's reliance on the collective knowledge doctrine. Since Detective Engelman was not directed by another officer to initiate a traffic stop, the Defendant argues that the traffic stop can only be justified by activities Engelman observed himself or information relayed to him by others. In other words, if another officer had information creating reasonable suspicion but did not relay that to Detective Engelman, the Defendant argues that information cannot be used to justify the traffic stop under the collective knowledge doctrine.

Even accepting the Defendant's argument, Detective Engelman testified that he was "in constant radio contact with the undercover surveillance." (Tr. 11.) Detective Engelman did not repeat every radio transmission he received throughout the day's investigation, but the Court interprets his testimony to mean that the events observed by Detectives Martin and Seiss, as well as other officers involved in the investigation, were all relayed to him. The Defendant also argues that because Detective Engelman did not testify specifically as to what traffic violations he knew had occurred but were observed by other officers, the violations that he himself did not observe cannot support the traffic stop. The most reasonable interpretation of Detective

26

Engelman's testimony is that the other detectives did relay the violations to him as they observed them and he was therefore aware of the violations. He testified, "I was originally going to stop the vehicle for the traffic infractions observed by the other detectives . . . ." (Tr. 14.) The only way that Detective Engelman could know that other detectives observed the traffic infractions would be for them to communicate that to him. Although the testimony may have been clearer if Detective Engelman had said "Detective Martin told me he observed the Defendant commit the traffic infractions of failing to signal within 200 feet of making a turn and illegal lane change," the Court interprets his testimony to mean the same.

b.    Probable Cause for Traffic Infractions

Even if Detective Engelman did not have a reasonable suspicion that the Defendant was engaged, or had recently been engaged, in drug trafficking, the stop was justified by the probable cause to believe that the Defendant had committed the traffic infractions of failing to adequately signal before turning and illegal lane change. "As a general matter, the decision to stop an automobile is reasonable where the police have probable cause to believe that a traffic violation has occurred." *Whren v. United States*, 517 U.S. 806, 810 (1996).

The Defendant's attack on the basis for the traffic stop is to argue that there was not probable cause to believe that he violated a city ordinance that prohibits obstructing free passage upon streets and sidewalks. That ordinance provides:

> It shall be unlawful for any person to obstruct the free passage along and upon any street, sidewalk, space between sidewalk and curbing, or commonly traveled portion of a street or other public place, and to place or permit to be placed upon such street, sidewalk, space between sidewalk and curbing, or commonly traveled portion of a street or any other public place, any thing or object whatsoever so as to obstruct or block the use thereof, or so to endanger the

27

life or limb, or property of other using such passage.

Fort Wayne, Ind., Code § 99.020(A).

The Defendant argues that there was no probable cause to believe he violated this city ordinance since the sidewalk ended (or began, depending on one's perspective) short of where the Defendant was parked. (Tr. 31; Gov. Ex. 1; Gov. Ex. 2.) The Defendant believes he therefore could not have obstructed passage along the street or sidewalk.

The government says that it does not matter that the sidewalk had ended. It argues that because the Defendant's front bumper at least partially extended onto the street, "Hayden could have forced pedestrian traffic to walk more toward the middle of the roadway and vehicle traffic to swerve a little to avoid his car." (Gov't Resp. 15, DE 49.) However, in interpreting an analogous state statute proscribing the obstruction of vehicular or pedestrian traffic, Ind. Code § 35-42-2-4, the Indiana Court of Appeals has held that the *potential* obstruction of traffic is not enough. *See Ransom v. State*, 741 N.E.2d 419, 422 (Ind. Ct. App. 2000) (finding no violation when Defendant drove car in reverse down road wide enough for only one car because he did not block the progress of any other motorist). To be guilty of the offense, one must actually obstruct the passage of pedestrian or vehicular traffic. The Fort Wayne City Code provides that the same principles and rules of interpretation apply to the city code as apply to Indiana state law. Fort Wayne, Ind., Code § 10.02(A). Here there is no evidence that the Defendant actually obstructed pedestrian or vehicular traffic.

Regardless, Detective Engelman had probable cause to stop the Defendant for other traffic infractions, and the Court therefore does not need to decide whether the Defendant violated the city ordinance proscribing the obstruction of streets and sidewalks. Detective

Engelman testified that he was originally going to pull the Defendant over for traffic infractions observed by Detective Martin, which would be permissible under the collective knowledge doctrine as explained earlier. It its irrelevant that he may have changed his mind and decided to stop the Defendant for other reasons because his subjective motivations do not matter. *See Williams v. Rodriguez*, 509 F.3d 392, 399 (7th Cir. 2007). The issue is instead whether a reasonable officer, with the same information known to Detective Engelman, would have had probable cause to make the stop. Such an officer would based on the observation of traffic infractions that Detective Martin communicated to Detective Engelman.

The Defendant's traffic stop was therefore legal based on Detective Engelman's reasonable suspicion that the Defendant was engaged in, or had recently been engaged in drug trafficking, and based on the probable cause to believe that the Defendant had committed the traffic infractions of illegal lane change and failure to adequately signal.

## 2.      *Consent to Search*

The Defendant's Motion to Suppress argues that the search was conducted "without sufficient consent to search." (DE 39 at 1.) "The Fourth Amendment accommodates warrantless searches when law enforcement officials receive voluntary consent to search." *United States v. Figueroa-Espana*, 511 F.3d 696, 704 (7th Cir. 2007). The government has the burden of proving that consent was freely and voluntarily given. *Id.* "The standard for measuring the scope of a suspect's consent under the Fourth Amendment is that of 'objective' reasonableness—what would the typical reasonable person have understood by the exchange between the officer and the suspect?" *Florida v. Jimeno*, 500 U.S. 248, 251 (1991).

The government produced an audio recording (the video recorder was not trained on either the detective or the Defendant) of the exchange between Detective Engelman and the Defendant that included the Defendant's consent to search his car. (Gov. Ex. 1.) Detective Engelman told the Defendant that he would be searching the car because he smelled marijuana, and he asked the Defendant for consent to search the car. (Tr. 33.) The Defendant refused. Detective Engelman then told the Defendant that he was going to "run a canine" on the car, and the Defendant then twice told the detective that he could search the car.

The Defendant implies throughout his briefing that the consent was involuntary because Detective Engelman told the Defendant that he was going to be searching the vehicle. But it was after that statement that the Defendant *refused* to consent. It was only after Detective Engelman told him that he would be using a canine that the Defendant changed his mind. And this second statement did not render the consent involuntary either. "Just as a statement by a law enforcement official that he will attempt to obtain a search warrant does not automatically vitiate an otherwise consensual search, [a detective's] statement that he was going to order a canine sniff does not automatically vitiate [consent]." *United States v. Robinson*, 984 F.2d 911, 914 (7th Cir. 1993). The Defendant may have gambled that by giving his consent he could prevent the canine sniff, but that risk-reward balancing does not undermine the voluntariness of his consent.

The Defendant also states throughout his briefing that the scope of the search was beyond what would have been reasonable to expect from his consent. However, the Defendant does not indicate what aspect of the search went beyond the reasonable interpretation of the Defendant's consent, so the Court has no basis for ruling in the Defendant's favor on that issue. He does state that consent does not include permission to inflict intentional damage to the places being

30

searched, but there is no evidence of any such damage or intent.

3.      *Probable Cause to Search*

The parties both state that if the Court finds that the Defendant consented to the search,

"it is all downhill from here" because the other justifications for the search simply become

alternative grounds for upholding the search. *United States v. McGuire*, 957 F.2d 310, 314

(1992).

> Under the "automobile exception" to the warrant requirement, a car may be searched
> without a warrant if there is probable cause to believe that the car contains
> contraband or evidence. *Carroll v. United States,* 267 U.S. 132, 149 & 153–56, 45
> S.Ct. 280, 283 & 285–86, 69 L.Ed. 543 (1925). Probable cause exists if, given the
> totality of the circumstances, there is a "fair probability" that the car contains
> contraband or evidence. *Illinois v. Gates*, 462 U.S. 213, 238, 103 S.Ct. 2317, 2332,
> 76 L.Ed.2d 527 (1983).

*Id.* Once police discover contraband in a car, they have probable cause to believe that the car

may contain additional contraband and may "search every part of the vehicle and its contents

that could conceal additional contraband, including the area beneath the passenger seat and the

trunk." *Id.*

When Detective Engelman detected the odor of marijuana and observed what he

reasonably believed (based on his training and experience) was marijuana on the floorboard, he

had probable cause to search the vehicle. That the canine "alerted" to the presence of drugs only

added to the reasonableness of Detective Engelman's probable cause determination. The

Defendant argues that the odor of marijuana alone does not justify a search that entails the

removal of the rear seat. However, the search was not predicated on just the odor of marijuana. It

was also based on the canine sniff and Detective Engelman's observation that marijuana was on

the floorboard. The brief period of time that elapsed between when Detective Engelman placed

the Defendant in the squad car and then observed the marijuana on the floorboard, somewhere

between ten and fifteen minuets, was not unreasonable in length and therefore does not

undermine the observation as a basis for probable cause. Because the area beneath a removable

seat could conceal additional contraband, the permissible scope of the search extended to that

area.

**4.      *Search Incident to Arrest***

"[W]hen a policeman has made a lawful custodial arrest of the occupant of an

automobile, he may, as a contemporaneous incident of that arrest, search the passenger

compartment of that automobile." *New York v. Belton*, 453 U.S. 454, 460 (1981). The

government argues that the search incident to arrest exception to the warrant requirement also

provides a legal justification for the search. The Defendant disputes that he was under arrest.

Neither side elaborates on the analysis of whether the Defendant was under arrest.

The search of the trap compartments likely exceeded the scope of what is permissible in a

search incident to arrest. Police may not search the trunk of a vehicle in a search incident to

arrest, *see Belton*, 453 U.S. at 461 n.4 ("Our holding encompasses only the interior of the

passenger compartment of an automobile and does not encompass the trunk); *but see United*

*States v. Arnold*, 388 F.3d 237, 240 (police may search a trunk that is readily accessible from

inside the passenger compartment as part of protective sweep or search incident to arrest), and

they may not dismantle portions of the vehicle. *See United States v. Patterson*, 65 F.3d 68, 71

(7th Cir. 1995) (search incident to arrest did not extend to dismantling interior tailgate cover). It

32

is not clear in this case whether the officers would be permitted to open the trunk or dismantle the rear seat as a search incident to the Defendant's arrest. Given that the parties do not elaborate on the analysis of whether the Defendant was under arrest or whether any search incident to arrest was broader than is permissible under the search incident to arrest exception, and given that the Court has upheld the search on other grounds, the Court declines ruling on the search incident to arrest issue.

**5.     *Inventory Search***

"Inventory searches are a recognized exception to the warrant and probable-cause requirements of the Fourth Amendment." *United States v. Cherry*, 436 F.3d 769, 772 (7th Cir. 2006). Police may lawfully search a car prior to towing if the search is conducted pursuant to standard police procedures aimed at protecting the owner's property and at protecting police from charges that they stole, lost, or damaged the property. *Id.* The government argues that the inventory search in this case was lawful, and the Defendant does not respond to this argument. It seems likely that the Defendant did not respond because he does not appear to be seeking the suppression of any evidence that was seized during an inventory search (other than of course his more general argument that any evidence seized is the fruit of an illegal traffic stop). The evidence which he seeks to suppress was recovered prior to any inventory search, so there is no issue regarding the inventory search for the Court to rule on.

**ORDER**

For the foregoing reasons, the Defendant's motion (DE 39) is **DENIED**. This matter will

33

be set for a telephonic scheduling conference within the next ten days.

SO ORDERED on July 16, 2008.

 s/ Theresa L. Springmann
THERESA L. SPRINGMANN
UNITED STATES DISTRICT COURT