# UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF INDIANA
### FORT WAYNE DIVISION

UNITED STATES OF AMERICA

v.                                    CAUSE NO.: 1:07-CR-68-HAB

TUREAN HAYDEN

## OPINION AND ORDER

The Defendant, Taurean Hayden, is serving a term of imprisonment for his convictions for possessing with intent to distribute cocaine (21 U.S.C. § 841) and carrying a firearm during and in relation to a drug trafficking crime (18 U.S.C. § 924(c)). He has been imprisoned since July 2007 and his projected release date is in September 2022. Defendant is incarcerated at the federal correctional institution in Mississippi known as Yazoo City Medium.

This matter is before the Court on Defendant's Motion for Compassionate Release [ECF No. 174], filed on April 8, 2020.[1] Defendant requests that the Court reduce his sentence so that he may be released to time-served or to strict home confinement for the balance of his sentence. Defendant, who is thirty-eight years old, submits that his current medical condition, combined with the risks associated with COVID-19, present extraordinary and compelling reasons for the reduction.

---

[1] Some of the evidence in support of this Motion was filed by Defendant on February 3, 2020, before counsel entered an appearance on his behalf. This earlier filing will become relevant to understanding the development of the record.

The Government's Opposition [ECF No. 180], filed on April 21, 2020, challenges the Court's authority to consider Defendant's request on the ground that Defendant did not exhaust his administrative remedies by first submitting his request to the warden. Thus, the Government asks that the Court deny Defendant's request or stay the proceedings until the BOP is afforded the statutorily-mandated time to make a decision.

In his Reply [ECF No. 181], Defendant takes issue with what transpired at the BOP after he completed a written request; he accuses his case manager of failing to submit it to the warden and then lying to a probation officer about the request. In any event, he maintains that the Court should consider the warden to have received notice of his request on the date he filed his pro se motion with the court—February 3—or the date he met with his case manager—March 3.

## ANALYSIS

A court's ability to modify an already-imposed sentence is limited. Defendant's request for release implicates 18 U.S.C. § 3582(c)(1)(A)(i), which provides that a court may only reduce a term of imprisonment if:

> (A) the court, upon motion of the Director of the Bureau of Prisons, or upon motion of the defendant after the defendant has fully exhausted all administrative rights to appeal a failure of the Bureau of Prisons to bring a motion on the defendant's behalf or the lapse of 30 days from the receipt of such a request by the warden of the defendant's facility, whichever is earlier . . . after considering the factors set forth in section 3553(a) to the extent that they are applicable, . . . finds that—
>
> (i) extraordinary and compelling reasons warrant such a reduction.

18 U.S.C. § 3582(c)(1)(A)(i). Because the Defendant, not the Director of the BOP, filed the motion, Defendant must satisfy the exhaustion requirement.

2

Exhaustion requirements can limit a court's subject matter jurisdiction by prohibiting a federal court "from adjudicating an otherwise legitimate 'class of cases' after a certain period has elapsed from final judgment." *Bowles v. Russel*, 551 U.S. 205, 212 (2007). But there is a "distinction between jurisdictional prescriptions and non-jurisdictional claim-processing rules, which 'seek to promote the orderly progress of litigation by requiring that the parties take certain procedural steps at certain specified times.'" *Fort Bend Cty., Tex. v. Davis*, 139 S. Ct. 1843, 1849 (2019) (quoting *Henderson v. Shinseki*, 562 U.S. 428, 435 (2011)). Congressional intent is key to determining whether a rule is jurisdictional. *See Sebelius v. Auburn Reg'l Med. Ctr.*, 568 U.S. 145, 153-54 (2013).

The Court does not agree with the Government that § 3582(c)(1)(A)'s exhaustion requirement is jurisdictional. In so holding, the Court takes its guidance from the Seventh Circuit's decision in *United States v. Taylor*, 778 F.3d 667 (7th Cir. 2015). In *Taylor*, the court held that "district courts have subject-matter jurisdiction over—that is, the power to adjudicate—a § 3582(c)(2) motion even when authority to grant a motion is absent because the statutory criteria are not met." Although *Taylor* was not addressing subsection (c)(1)(A)'s exhaustion requirement, it is persuasive in pointing out that § 3582 is not a part of a jurisdictional portion of the criminal code and is not phrased in jurisdictional terms. 778 F.3d at 671; *Cf. Davis*, 139 S. Ct. at 1850–51 (noting that Title VII's charge-filing requirement did not speak to a court's authority or refer to jurisdiction but to a party's procedural obligations). The court also reasoned that the Supreme Court in *Freeman v. United States*, 564 U.S. 522 (2011), when considering whether § 3582(c)(2) was available to a defendant who had entered a binding plea agreement under Federal Rule

3

of Criminal Procedure 11(c)(1), "addressed the issue in terms of whether the defendant was statutorily eligible for a sentence reduction, not whether the district court had subject matter jurisdiction to decide his motion." *Id.*; *see also United States v. Cox*, No. 418CR17TWPVTW, 2020 WL 1923220, at *3 (S.D. Ind. Apr. 21, 2020) (finding rationale of *Taylor* applicable to § 3582(c)(1)(A) to conclude that the exhaustion requirements are not jurisdictional).

Even a non-jurisdictional exhaustion requirement, however, is not necessarily subject to waiver by a court over the government's objection. *See Cox*, 2020 WL 1923220, at *2–*3; *Davis*, 139 S. Ct. at 1851 (finding that statutory charge-filing requirement was a mandatory processing rule even though it was not jurisdictional). Because § 3582(c)(1)(A)'s exhaustion requirement is not a judge-made doctrine, but derives from the statute itself, a court can only create exceptions to exhaustion where Congress intended. *See Ross v. Blake*, 136 S. Ct. 1850, 1857 (2016) (noting that when Congress "sets the rules" for statutory exhaustion provisions they are not susceptible to judge-made exceptions). The plain language of § 3582(c) requires that a prisoner moving for a reduction in his sentence for extraordinary or compelling reasons either (1) fully litigate his claims administratively before the BOP, or (2) wait thirty days after serving his request to the warden—whichever is earlier.

To be sure, the presentation of these choices appears unique among exhaustion requirements. *See United States v. Scparta*, No. 18-CR-578 (AJN), 2020 WL 1910481, at *6 (S.D.N.Y. Apr. 20, 2020) (noting that the statute "does not necessarily require the moving defendant to fully litigate his claim before the agency") (quoting *United States v. Haney*,

4

— F. Supp. 3d —, No. 19-cr-541 (JSR), 2020 WL 1821988, at *3 (S.D.N.Y. Apr. 13, 2020)). In this way, the statute is unlike the traditional exhaustion scheme the Supreme Court considered in *Ross*. This unique provision begs the question: is the thirty-day judicial backstop intended to relax the first part of the rule, or, is it the minimum that must be satisfied to obtain an exception to full exhaustion through the BOP's administrative process? In the end, the Court need not answer that question today, as it finds that Defendant has satisfied § 3582(c)'s exhaustion requirement.

## A.     Administrative Exhaustion

Defendant asserts that he filed a request for compassionate release directed to the warden on December 3, 2019. Alternatively, he claims that counsel for the Government became aware of the request on February 3, 2020, when Defendant filed a motion with the Court, and that his case manager became aware of his request on March 3. Both, he claims, should be knowledge that is attributed to the warden. Therefore, because more than thirty days have elapsed with no response from the warden, he has satisfied the administrative exhaustion requirement.

When he was still proceeding pro se, Defendant supplied to this Court an Inmate Request to Staff form (ECF No. 166-3 at 4, filed on Feb. 3, 2020), dated December 3, 2019. The handwriting on the form indicated that Defendant was requesting that the warden bring a motion for compassionate release on his behalf because he was in stage 3 kidney disease. But the request contains no staff member signature or date to indicate it was given to prison staff.

After the Defendant's pro se submission, a United States Probation Officer made inquiries regarding Defendant's request in preparation for filing a memorandum with the Court. In that memorandum (ECF No. 172), filed on March 30, 2020, the probation officer advised the Court that she could locate no record of the warden having received any such request. Additionally, there was no record of the request in the prison's Reduction in Sentence electronic tracking database.

The probation officer's report also included what she learned during a telephone meeting with Defendant's case manager, Latarsha Montgomery, who was present in her office along with Defendant during the meeting. Ms. Montgomery confirmed that she was unable to locate any request from December 3 or any other date in Defendant's central file. Defendant was given an opportunity to provide any information to show that his December 3, 2019, request was submitted to prison staff or to the warden for review, but he could not recall the name of the staff member to whom he gave the request. Defendant also acknowledged that he had not taken any action to follow-up with his case manager to inquire whether his request had been received for processing.

Defendant argues that the lack of signature on the December 3 form is not compelling because the form he provided to the Court is only a copy that he prepared for himself; it is not the copy that he gave to his case manager and his counselor the same day he prepared it. Defendant asserts that he has no way of knowing what happened to it after he handed it to them. Defendant "believes that if someone were to open his 'file' right now at the BOP, the December 3, 2019 Inmate Request Form would be there." (Reply 2.)

Defendant's claim that he handed the inmate request form to his case manager and his counselor on December 3 is offered for the first time in his Reply Brief, even though the Motion for Compassionate Release [ECF No. 174] filed through counsel was made *after* the probation officer's report concerning the lack of any evidence that Defendant provided the December 3 form to prison staff. That report, as indicated above, clearly stated that Defendant could *not* remember the name of the staff member to whom he provided the December 3 form. Certainly, had he handed it to his case manager, he would have remembered. Making such a dubious allegation is not productive.

As indicated above, Defendant does not restrict his exhaustion arguments to the December 3 form. As an alternative, he asks the Court to connect a series of dots to find that the March 3 meeting satisfies his exhaustion requirement. The first point he deems salient is that his December 3 request was clearly a topic of discussion at this meeting. That much is undisputed. Defendant then maintains, without any citation to the record, that Ms. Montgomery had a copy of his inmate request form in front of her during the meeting with the probation officer. That is where his argument breaks down.

The Court cannot accept the unverified say so of counsel—who was not a participant in the meeting—as proof that Ms. Montgomery possessed the form. Neither do the reasonable inferences from the report support that conclusion. To be sure, Defendant's pro se motion, which included the December 3 inmate request form, prompted the probation officer to discuss the form with Ms. Montgomery. But there is no indication from the report or otherwise that Ms. Montgomery herself had a copy of the request. To be fair, nothing in the report indicates that she did not have the form. But

Ms. Montgomery's March 3 response to an email from the Northern District of Indiana Federal Defender's office advises that Defendant was asking to be reviewed for a compassionate release and had been provided information about the process that he was required to take. This communication conveys, even if only indirectly, that Defendant had not yet started the process. To date, the only request that has made its way to the Yazoo City FCI warden is a request Defendant's counsel submitted on April 8, 2020.

Whether Ms. Montgomery possessed a copy of Defendant's December 3 form, however, need not be dispositive. As Defendant sees it, his case manager had a duty as a result of the March 3 meeting to forward his request for compassionate release to the warden because she serves "as a liaison between the inmate, the administration and the community." (Admission and Orientation Handbook, FCC Yazoo City, Mississippi (last revised October 2011), ECF No. 174-11 at 5.) The Court finds merit in this point, at least under the narrow circumstances of this case. Defendant's case manager was aware, according to her correspondence with counsel, that Defendant was seeking compassionate release. Indeed, by that time, Defendant had already filed a motion with the court. Although Ms. Montgomery apparently also provided Defendant with information about the process—an act that suggests she anticipated he would take further action on his own—this Court has not received any explanation why Defendant's articulation of his request to his case manager was insufficient to begin that process.

In the end, staff at the BOP had sufficient notice of Defendant's request that it can be deemed to have been under consideration for at least thirty days. Accordingly, the

Court need not determine whether the Court can waive the exhaustion requirement of § 3582(c) over the Government's objection.

**B.      Extraordinary and Compelling Circumstances**

Defendant is eligible for compassionate release only if he can demonstrate, after consideration of the factors set forth in § 3553(a), that there are "extraordinary and compelling reasons" for a sentence reduction and such a reduction is "consistent with applicable policy statements issued by the Sentencing Commission." 18 U.S.C. § 3582(c)(1)(A).

The Sentencing Commission's relevant policy statement on compassionate release identifies medical conditions that satisfy the "extraordinary and compelling" requirement. U.S.S.G. § 1B1.13, cmt. n. 1(A). Relevant here, extraordinary and compelling reasons exists where a defendant is "suffering from a serious physical . . . condition . . . that substantially diminishes the ability of the defendant to provide self-care within the environment of a correctional facility and from which he or she is not expected to recover." *Id.*, n. 1(A)(ii)(I). A catchall provision allows the director of the BOP to determine that a combination of reasons presents an extraordinary and compelling reason. *Id.* n. 1(D).

*1.      Defendant's Medical Condition*

Defendant's motion relies on claims that he is likely in Stage 4 of Chronic Kidney Disease with continued decline in kidney functioning, has other potential medical problems, is not receiving sufficient care, and should be designated at Care Level 3 but

remains at a Care Level 1 facility.[2]  Defendant has submitted a Record Review that was completed by Dr. Robert Gregori, M.D., on April 24, 2020. Dr. Gregori opines that Defendant is suffering from lupus, or systematic lupus erythematosus, a chronic autoimmune inflammatory disease that is affecting his skin, joints, and kidneys. According to Dr. Gregori, a Lupus flare that impacts the kidneys "has the potential to be life threating if appropriate intervention is not taken and this appears to be the case with [Defendant], as he meets the criteria for severe stage 4 renal failure." (Report, ECF No. 187-7 at 7.) If this renal failure progresses, Defendant will require dialysis.

Dr. Gregori's position is that Defendant must be treated by both a nephrologist and a rheumatologist working in conjunction to treat Defendant's Lupus flares and kidney functioning. Additionally, treatment is highly variable, as it depends on the organ systems and tissues involved, how the patient responds to therapy, and costs and availability of treatment. Defendant should also adhere to special dietary restrictions.

According to the Government, these claims are not uncontroverted. The Government notes that Defendant has been classified as a Care Level 2 inmate because his chronic kidney disease is stable. Additionally, he is receiving ongoing medical care, including specialized care from a nephrologist. Rather than elaborating on these points, however, the Government asserts that these discrepancies are one of the reasons

---

[2] An inmate's Care Level is a classification of his medical and mental health conditions so he can be assigned to BOP institutions that can best meet his health care needs. Levels range from the lowest Care Level 1 to the highest Care Level 4, with 4 being designated for inmates with severe impairment in functioning, such as cancer on active treatment, dialysis, quadriplegia, and stroke or head injury patients.

> why the BOP should be allowed to assess his medical condition as it is
> doing under his April 8, 2020, compassionate release request. Their efforts
> which include an assessment of his medical condition will significantly
> benefit the parties and the Court in its consideration of the matter. During
> the review by the Warden, Hayden will be given consideration under the
> Attorney General's Memorandum involving home confinement and the
> COVID-19 outbreak. The government reserves the right to present
> argument at the appropriate time on this latter element.

(Opp'n at 3 n.1.)

As another point of contention, Defendant asserts that he is in a COVID-19 high-risk category per the guidance published by the Center for Disease Control (CDC). That assertion requires elaboration. Although the CDC has categorically placed persons with chronic kidney disease who are undergoing dialysis on its list of those especially vulnerable to COVID-19, Defendant is not undergoing dialysis. *See* https://www.cdc.gov/coronavirus/2019-ncov/need-extra-precautions/people-at-higher-risk.html. Dr. Gregori opines that a patient with properly controlled and managed lupus is not at an increased risk of transmitting COVID-19 or suffering complications. However, if actively treated with immunosuppressant medications, the individual is at increased risk of contracting COVID-19 and having severing complications from the virus. (Report, ECF No. 187-7 at 7.) The COVID-19 risks are less known as it relates to renal failure, with the thought being that it presents only a slightly increased risk.

### 2.    *BOP's Response to COVID-19*

Of all the topics of the parties' briefs, none has proved more frustrating to the Court than their discussion of the BOP's response to COVID-19. The Government provides details about the measures the BOP has taken to curb the spread of COVID-19,

but it provides no details regarding the conditions where Defendant is housed. Defendant, too, sticks mostly to a generic, non-facility-specific rebuttal.

First, the Government notes that on March 13, 2020, the BOP began to modify its operations in accordance with a Coronavirus (COVID-19) Action Plan (the Action Plan), to minimize the risk of COVID-19 transmission into and within its facilities. The Government further notes that the BOP has repeatedly revised the Action Plan to address the crisis. Specifically, on April 1, 2020, the BOP implemented Phase Five of the Action plan, which currently governs its operations. Phase Five requires all prisoners in every BOP institution to be secured in their assigned cells or quarters for a period of at least fourteen days; allows only limited group gatherings to continue access to commissary, laundry, shower, telephone and computer access; and severely limits prisoner movement among its facilities. Staff travel and most staff training has been cancelled.

Additionally, the Government represents that all staff and prisoners have been issued face masks and have encouraged face covering when in public areas where social distancing is not possible. The Government also provides details about how prisoners and staff are screened and isolated if they are experiencing any symptoms, and how access to BOP facilities is restricted.

The Government explains that the BOP is exercising greater authority to designate prisoners for home confinement. On March 26, 2020, the Attorney General directed the BOP's Director to prioritize the use of statutory authority to place prisoners in home confinement. In particular, pursuant to 18 U.S.C. § 3624(c)(2), the BOP has the authority to place a prisoner in home confinement during the last six months, or 10%, of his or her

sentence. Under 34 U.S.C. § 60541(g), the BOP is authorized to move elderly and terminally ill prisoners to home confinement. The BOP was awarded additional authority under the Coronavirus Aid, Relief and Economic Security Act (CARES), enacted on March 27, 2020, to increase the "maximum amount of time" that the BOP Director may place a prisoner in home confinement, if the Attorney General concludes the emergency conditions will materially affect the functioning of the BOP. Pub. L. No. 116-136, § 12003(b)(2), 134 Stat. 281, 516 (to be codified at 18 U.S.C. § 3621 note). The Attorney General authorized the BOP director to exercise that discretion, beginning with the facilities with the greatest number of COVID-19 transmissions.

Defendant challenges the Government's assertions. He maintains that "[d]aily updates from multiple, legitimate news media outlets paint a vastly different picture than the one the Government chooses to display to the Court." (Def.'s Reply 16.) None of the cited material—which ranges from a Union grievance filed with OSHA, to a congressional blog, to an ACLU lawsuit—is specific to Yazoo City. Defendant relies generically on the assertion that prison facilities present unique challenges for control of COVID-19 transmission. His Motion does not attempt to describe the conditions that are present at his particular institution, or to explain why the mitigation measures put in place have not been effective to date or will become insufficient under the circumstances in which he is housed. *See* COVID-19 Action Plan.[3]

---

[3] Available at https://www.bop.gov/resources/news/ 20200319_covid19_update.jsp.

The only Yazoo-City-specific information noted is that Yazoo City Medium had seven confirmed cases of COVID-19 among inmates as of April 8, 2020. *See* https://www.bop.gov/coronavirus. As of April 22, that number was still seven—perhaps suggesting that mitigation efforts were successful—but as of April 27, the number of positive inmates reported was one. As there have been no inmate deaths, the Court must assume that inmates have been transferred or released, or recovered. The Court has no other information that might shed light on the conditions at Yazoo City.

### 3.   *Application to Defendant's Circumstances*

What all this means is that too many questions remain for this Court to find that Defendant has proven that extraordinary and compelling reasons warrant a reduction of his sentence. In consideration of the § 3353(a) factors, the analysis is a wash. The Defendant committed a serious drug trafficking crime after amassing an extensive criminal history before reaching his mid-twenties. He was a fugitive for four months after he bonded out on state charges and before the United States Marshals Service arrested him in the federal matter. But that was nearly thirteen years ago, and Defendant has displayed conduct while at the BOP that could suggest he is no longer a danger to the community, particularly if he is under supervision and is also undergoing medical care for a serious health condition.

Under normal circumstances, Defendant's medical conditions would not reach the extraordinary and compelling standard. His illness is not terminal. While it presents a risk of serious functional impairment such that he would be unable to provide self-care while imprisoned if he experiences a flare of his Lupus, the solution in that instance

would be temporary care outside the facility. Defendant was previously hospitalized during a flare. That Defendant's disease is highly variable, and "characterized by a relapsing-remitting course with periodic flares in the disease" (Dr. Gregori Report, ECF No. 187-7 at 6) does not lead to the conclusion that the Court must assess his ability to self-care only during a flare. According to Dr. Gregori, the medications for treatment are common. The variability of the treatment depends on the organ systems and tissues involved, which have already been identified for Defendant. Defendant has not established that the BOP is less qualified to provide treatment in light of the other variables that Dr. Gregori identifies, namely, how the patient responds and cost and availability.

The onset of the COVID-19 pandemic warrants additional consideration. Although Defendant's arguments about COVID-19 are too general and wide-ranging to meet the criteria for extraordinary and compelling reasons for a reduction in sentence set forth in the Sentencing Commission's policy statement, additional information about the conditions at Yazoo City and about Defendant's access to specialized care if he stays in the BOP might prove dispositive. Any decision to reduce Defendant's sentence, though, would require that the Court consider the alternative, i.e., his release plan.

The Defendant maintains that he will live with Kenesha Williams, a family friend. Ms. Williams also applied for a house for Defendant to live in by himself and she has submitted a Medicaid application on his behalf. Defendant has identified a nurse practitioner he would see as his primary care provider. Defendant consents to location monitoring.

This bare-bones plan does not convince the Court that Defendant's standard of care would improve by seeing a nurse practitioner, or that his risk of exposure to COVID-19 would decrease. There is no information how Defendant would get to appointments, what measures Ms. Williams has taken to limit her exposure to the virus, or whether she resides with other individuals. There is the question of how Defendant will receive essential supplies and the food that is needed for his specialized diet. Although these may be insignificant matters under other circumstances, they are part of the Court's analysis when he is asking to be released as a measure that will lessen his risk of exposure to COVID-19.

At this point, speculation as to a prospective outbreak of COVID-19 at Yazoo City is insufficient to demonstrate a compelling reason for Defendant's release. The Court is lacking vital details concerning Defendant's access to treatment at the BOP as compared to outside the BOP if released, as well as the risk of contracting COVID-19 while in custody at Yazoo City.

## CONCLUSION

For the reasons stated above, the Court DENIES Defendant's (Emergency) Motion for Compassionate Release [ECF No. 174] without prejudice to refiling if additional evidence supports the motion.

SO ORDERED on April 30, 2020.

 s/ Holly A. Brady
JUDGE HOLLY A. BRADY
UNITED STATES DISTRICT COURT